May it please the Court. My name is Stephen Bomsey, and I appear this morning on behalf of the appellant Weyerhaeuser. Your Honors, this is a case that involves an all-too-common effort by an unsuccessful competitor to use the antitrust laws to restrain vigorous competition and reward inefficiency. That is the antithesis of what our antitrust laws are all about. There is a specific issue that we believe is central to the determination of this case, and that is whether a firm can violate Section 2 of the Sherman Act by paying too much for raw materials where the products that are then produced from those materials are resold at a profit. We, of course, suggest that as a matter of law, the answer to that is no. Time permitting, I'm going to try and cover three points. The first is that because of the absence of meaningful barriers to entry, Weyerhaeuser had no ability to acquire or maintain monopoly power over the alder saw log purchases which are involved in this case. Well, wasn't that a jury question which the jury went against you? It is a jury question, Your Honor, if there is in fact sufficient evidence as a matter of law of barriers to entry. We would suggest that on that question there were in fact no adequate proof of barriers to entry as a matter of law. So you think that the evidence showing a decline in the number of firms and the entry of four new ones is enough to require us to set aside the jury verdict? I think that is pertinent, but I don't think it's the essential point. There were really three barriers to entry which were identified by the plaintiff during trial, and none of those three as a matter of law are sufficient. The first is the presence of Weyerhaeuser itself as a dominant firm and efficient competitor, a too vigorous competitor, if you will. Judge Kaczynski and Sciufi rather emphatically emphasized that that as a matter of law is not a barrier to entry. The second barrier to entry that was identified is capital costs. But capital costs themselves are not a barrier to entry. What is a barrier to entry is that one firm in fact incurs greater capital costs. There was no proof of that. The third barrier to entry that was identified by the plaintiffs at trial was that there was a scarcity of raw materials. But the record shows without question, undisputed on both sides, that there were in fact adequate raw materials available at all times to the plaintiff had it been able to afford it. So for those reasons, there is a matter of law are no barriers to entry in this case sufficient to sustain the jury verdict. Now, on appeal, we are referred to economies of scale as to which there is some debate in both the case law and the literature about whether that is in fact an acceptable barrier to entry at all. But we don't need to worry about the legal issue here because it was not raised at trial. There was no testimony about it, no expert opinion about it. So that cannot justify the verdict here. Is it your position that the dominant position in the market, 65%, is not relevant to the determination of barrier to entry? Well, it is certainly our position, and I think well supported in the case law, that mere market share does not establish a basis for a finding of monopoly power in the absence of evidence from which a jury could properly conclude that that dominant position could be maintained. The absence of barriers to entry is, as a matter of law, a sufficient basis to reverse on that ground. Wasn't there evidence in this case of market power, testimony by the accountant, Mr. Price? There was testimony. Was that his name? I'm sorry? Was it Mr. Nowak? There was a suggestion, Your Honor, which in fact is evidence only of this person's views on the subject. But the question is, is there any evidence that is sufficient in the record as a matter of law, Mr. Nowak not being an expert? Is there testimony that is sufficient to say that there is market power here as sufficient, as I say, to go to the jury? But whether or not the court agrees with Weyerhaeuser on that ground, it seems to me that the second issue, which is where I want to turn and spend most of my attention, ought to be dispositive, and that is the question of pricing. The question that I suggested is central to this case. We believe that the law following Brook Group now ought to be clear that in the absence of proof that the purchases, the purchase prices paid were so high that the resulting products could not be sold at a profit, and there is no dispute here that that standard could not be met, was not met. There was no dispute about that, and there's no dispute on appeal. We believe that Brook Group and its logic requires the court to reverse as a matter of law. Is there any evidence of consumer welfare following from the pricing decisions in this case as there were in Brook Group? Your Honor, I think the answer is yes. What is it? The answer is that when you have increasing supply, which of course higher prices will draw, over time you are going to have consumer welfare benefits, whether it be in the form of increased supply, which will lead to lower prices, whether it be in the form of innovation. But I think the question was what was the evidence in this case of consumer welfare? The evidence in this case of consumer welfare, it seems to me, was ambiguous. But that is not, with all respect, Your Honor, the question. We have, if I am correct about the legal standard, we have a bright line test, and it is there for two very important reasons which the Supreme Court and other courts have emphasized. The first of those reasons is that we need a rule which is administrable. The second is that we do not want to run the risks of false positives. The antitrust laws are concerned with efficient allocation of resources. This court said it in Pool Water. It said it very clearly in Rebel Oil, that the issue that the antitrust laws are concerned with is an allocation of resources. Let me quote, Consumer welfare is maintained when economic resources are allocated to their best use. That is a rule which can only be fulfilled for exactly the same reasons economically, on the buy side as on the sell side. That can only be implemented by the bright line rule for which we argue. But how does the payment of higher prices for supplies serve the interest of efficient allocation of resources? It leads to greater entry. It leads to increased output. It will lead in the long run, under ordinary circumstances, to lower prices or to better quality of goods. Counsel, how does it lead to greater entry? How does payment of higher prices lead to greater entry? If I am a person who is able to harvest saw logs and somebody will pay more for them, I am more likely to harvest them. So it leads to greater entry on one end of the spectrum, the selling end. But how about on the buying end? On the buying end, Your Honor, we're not interested in entry. We don't have entry at the buying end. But there will be fewer people. I mean, is your premise that there will be more people who will be selling the product that the higher price is geared toward? Yes. So we're not concerned about whether or not there will be more people in the market to buy those? That doesn't come into the equation at all in your analysis? Well, Your Honor, we would think that over time there would be an improvement of welfare in the downstream market as well. Although, again, here we have the market for the purchase of the finished product, that is the lumber. But the point is that the antitrust laws are concerned equally with the sell side and with the buy side. That is, if the antitrust laws were only concerned with end prices to consumers, we might say we need to look at that. But that is not, in fact, I suggest to the Court, the case. The antitrust law is concerned with what happens to suppliers. The antitrust laws have long said that it can be a per se offense to conspire to pay too low prices to sellers. If we, in fact, were only concerned with the consumer side of this, why would that be the law? Consumer welfare is something we are concerned with, but it is a complex process, and it is one in which the antitrust laws care every bit as much, I submit, about sellers as they do about end users, and for good reasons. What we believe in are markets. We believe that in the long run, not having people constrained by artificial rules and incredibly ambiguous rules, if you look at the jury instruction in this case, which referred to paying higher prices than are necessary in order to prevent Ross Simmons from acquiring logs at a fair price. That's the finding that the jury made. Would you agree that the jury made that finding? Absolutely. Okay, and is it your position that that finding cannot stand under the governing law? It is absolutely our position, and it is our position that that jury instruction was incorrect as a matter of law. The correct jury instruction that needed to be given was a group-based jury instruction. That is, that the prices that were paid were such that the products could not be sold at a profit, and second, that there was a dangerous probability of recoupment in the so-called second stage of the monopolization. So if we disagree with you regarding the binding effect of group, you lose? If you were to disagree with us that there is no analog to Brook Group on the buy side, and if you were to determine that the jury instruction and its use of the term necessary to pay fair price by the competitor is an acceptable statement of the law, then on that basis, we would have lost as to that issue. Now, that would not take care of the question of market power, which I addressed in response to Judge Schwarzer's question a little bit ago, but on that issue, if you were to determine that there is no analog to the Brook Group standard, and if you were to determine that the jury instruction adequately stated the law for the jury, then we would not prevail on that issue. We believe that we ought to prevail on that. Can we go back to the Brook Group analysis? We're really dealing here with three levels of markets, right? We deal with the market for logs, and we deal with the market for the finished product, and then somewhere down the line to the consumer products. The fact that higher prices are paid for logs stimulates presumably the supply of logs, but it would tend to diminish the market with respect to the products that come out of the mills because the higher prices will not be paid by all. Some of the mills will not be able to pay those prices, so there would be a reduction in supply, and I don't see how that would benefit the efficiency analysis that you've put forward. Well, that depends on a whole variety of circumstances, and I think, in fact, Judge Hoarser, the economic literature in this area generally suggests that you are likely to have long-run increases in output at the end use as well. But, again, I think that that asks slightly the wrong question. I mean, it tends to suggest that there is an obligation on the part of a defendant to show that consumer prices are going to go down in the downstream market or actually did go down in the downstream market. I think it's important to note, by the way, in this case, if we are talking about the facts of this case, although we think that the rule here is a broader rule, but if you're talking about the facts in this case, the jury, in fact, rejected the notion that Weyerhaeuser had any market power in a downstream market. There was a competitive market there to begin with. So what you're likely to find over time is that there is greater stimulus for supply, there is greater stimulus for efficiency and innovation on Weyerhaeuser's part in order to be able to produce more, which will tend, even in a competitive market over time, to yield consumer benefits. But, again, I don't think that the rule that we suggest needs that. I think what it needs is the same kind of analysis which courts went through so painfully and for so many years on the sell side. That is that the court in Brook Group looked at the fact that, yes, you can end up with situations in which you will, in fact, be letting somebody who is engaged in predation, even successful predation, get away with it, to use those terms. But the court says what is far more important is that these schemes are so rarely tried and so unlikely to be successful and the danger of false positives is so high that we are going to impose a bright line rule. It's a rule that when you were on the district court, of course, in Murphy-Tugboat on the sell side, you thought was the appropriate rule. At the time, Reed Brothers, which we haven't discussed, was decided. It followed right in the wake of Inglis, and there was still a debate going on in the Ninth Circuit. But in footnote five, in Reed Brothers, this court back then said that on the sell side and the buy side were going to apply the same rule. If you look at footnote five in Reed Brothers, it cites in a buy side case, involving Forrest Products, in fact, it cites to the sell side precedence. It, of course, cites to different sell side precedence because Inglis was then thought to be, by that panel, the controlling law in this circuit. But Inglis was, of course, disavowed by the Supreme Court when it got to Brook Group. But if one takes the logic of Reed Brothers and the logic, I believe, of the economic literature and the logic of why we ought to prevail in this case and simply applies it here, then Weyerhaeuser is entitled to reversal. It seems to me that we ought not to have a rule of law which makes the legality of a competitor's prices turn upon the efficiency or lack of efficiency of its competitors. As I said when I began, that strikes me as absolutely antithetical to what we are trying to accomplish in the antitrust laws. The antitrust laws are concerned with supply. They are concerned with downstream demand. They are concerned with buyers and sellers. But they are not concerned with inefficient competitors. Suppose that Weyerhaeuser, in this case, had made arrangements with the suppliers of logs saying, if you sell exclusively to us, we'll pay you a higher price than you would otherwise get on the market. Would that be okay? We would then be into a different area of the antitrust laws. We'd then be into the question of foreclosure and Gilbargo. But isn't there foreclosure in this case by the willingness of Weyerhaeuser to pay higher prices than would otherwise be paid on the market? There can always be foreclosure by price, Your Honor. That's every bit as true in a Brook Group-type case. I don't see how that's analogous. Price can always be a weapon of competition. Or exclusion. It can be a weapon of exclusion. But exclusion is just a conclusion that we apply. When we say we don't care, in fact, we encourage more efficient competitors to succeed and less efficient competitors to fall by the wayside. We are saying that as long as there is nothing that as a matter of law can constitute predation, that is considered to be a good thing antitrust-wise. And saying exclusion describes something that occurs, it doesn't tell us anything about whether that exclusion is or should be permissibly held to be illegal. And our position here is that you simply can't take evidence of somebody's buying inputs at a price which was not unprofitable and say that is a sanctionable offense under Section 2 of the Sherman Act. You can't do it because it defies the logic of Brook Group, but you shouldn't do it because it defies the logic of markets. And it defies the logic of what the antitrust laws, it seems to me, are and are said to be about. The Supreme Court of the United States has been, I think, about as clear as it can be, not only in Brook Group, but very recently in Trinco, in being very concerned about administrability, being very concerned about false positives. And that's exactly what we have, it seems to me, in this case. I note that my time has expired. If permissible, I would love to have the opportunity to briefly address in rebuttal. We'll give you one minute for rebuttal. Thank you. Please proceed, counsel. May it please the Court. I'm Mike Hagelin for Plaintiff Ross Simmons Hardwood Lumber Company. In this case, which involves the monopsonization of an inelastic regional resource, an input market, there are three reasons to affirm. Let me state them briefly. First, there is no justification for the novel and unprecedented extension of Brook Group that Weyerhaeuser seeks on appeal. Second, Reed Brothers, which is directly on point, both in terms of the marketplace, another inelastic log market, and in terms of the anti-competitive tactics deployed, should not be overruled. And third, there are two categories of anti-competitive conduct, the factual sufficiency of which Weyerhaeuser did not challenge in its JMOL at the end of the case. Either one of which is sufficient to affirm this general verdict, which, incidentally, Weyerhaeuser invited. The Brook Group argument that Weyerhaeuser makes is exceedingly superficial. It is not only based entirely on symmetry, but it is completely disconnected from the unique economics that prevail in an inelastic resource-based input market like Alder saw logs. But don't the principles that animate Brook Group, that is, administrability and avoiding false positives, apply in this context as well as in the other context? We don't think so, Your Honor. If you look at the two principles or the two twin pillars of the rationale in Brook Group, one is a fear of chilling pro-consumer price cuts in an output market. Here we have a situation where the challenged behavior was raising prices in an input market. There is no potential for chilling output to the benefit of consumer in this setting. The other pillar or basis for the reasoning in Brook Group was that considerable case development, as well as mountains of scholarly comment and commentary, suggested very strongly that predatory pricing in an output context is rarely tried and rarely successful. Here we have a very unique marketplace, an inelastic log market. If you look at the few monopsony cases that there are, unlike predatory pricing output cases where there are legion and lots of commentary, we only have a few monopsony cases. If one looks at those, and I'm talking about American Tobacco, Case Swain, another Ninth Circuit case involving the oranges for the juice market in Southern California and Arizona, and Reed Brothers, a log market, we can see that monopsonization is tried and does work, and it worked here and the jury so found. We are not talking, Your Honor, about the retail price and competition among the producers of bubble gum, which would benefit the consumer in the form of retail price cuts. This is an inelastic natural resource that takes 30 years to mature. If the monopsonization of a log market is not arrested, future supplies will fall because landowners will fear the lack of a competitive log market in the future. As a result, alder will not be replanted following its harvest. Alder log supplies will therefore fall. Input prices will correspondingly rise as well, and output prices will follow, and the consumer is ultimately harmed through the monopsonization of an inelastic market like this one. Without this type of case and the case that followed it, there would have been every real prospect that alder lumber would follow the path of cherry lumber, which has risen in price consistent with its growing scarcity. Let me turn to Reed Brothers for a few minutes. Reed Brothers is critically important to examine closely because the Supreme Court in Trinco, which Mr. Bromsey mentioned, has long emphasized the importance in Section 2 cases of a fact-specific, industry-sensitive approach that is attuned to the particular structure and circumstances of the industry at issue. Reed Brothers is another log market case, and it is on point in two very significant ways. First, it also included or involved an inelastic log market. Now, why do I say inelastic? By that, I mean that rising prices, one of the premises of the Weyerhaeuser argument in its briefs, rising prices for the log inputs is going to increase the supply of those inputs. Not so in an inelastic market, and that's what happened in Reed Brothers as here. In Reed Brothers, the entire market was the softwood logs from the Tongass National Forest, which are constrained by strict sustainability requirements limiting the annual supply. Here, too, it's acknowledged by all sides that alder is likewise inelastic. Weyerhaeuser documents characterized it as at least 70 percent inelastic because it's the so-called come-along species. It's a minor species mixed in with the much more predominant softwoods west of the Cascades in Oregon, Washington, and British Columbia. Therefore, it comes along out of the woods when those dominant softwood species are harvested. It is classically an inelastic market. The other parallel to Reed Brothers, where it's directly on point, is the use of the same type of exclusionary tactics. Leave log pricing aside for the moment. Two that existed in Reed Brothers and also were presented in the evidence below were foreclosure of the market by acquiring competitors. Weyerhaeuser acquired three of the top five alder industry players in just a five-year period. Counsel, isn't it your position, though, that the factual sufficiency of that claim was not challenged? Absolutely, that's correct, Your Honor. The other category of evidence that was unchallenged was overbuying. Weyerhaeuser acknowledges in its brief that overbuying could be an anti-competitive act but contends that it was only episodic in the case here rather than systematic. We're only looking at the overpricing element here on appeal. Is that your view? Well, Weyerhaeuser tries mightily, I think, to shift the emphasis on appeal and characterize this as a pricing case only when, in fact, there was much more to it. I tried the case below. I have trouble recognizing the so-called pricing case that Weyerhaeuser puts forth on appeal and what was actually tried below. But if there is an erroneous jury instruction on the pricing issue, that would knock out the case, right? Brook Group, assuming you accept the argument about Brook Group. Well, if you assume for the sake of argument that Brook Group is the law and should have informed the nature of the jury instruction as it related to log pricing, we acknowledge in our brief that the instruction was incomplete. But if you look at the entirety of the instructions, and the goal here in jury instructions is to get instructions that are substantially correct. If you look at the definition of anti-competitive conduct, if you look at the reference to barriers to entry, to the potential for recoupment, and if you look at what Judge Panner actually said there, whether one of the plaintiff's contentions in this case is that the defendant purchased more logs than needed or paid a higher price than necessary. Weyerhaeuser likes to end the statement there. It goes on, in order to prevent the plaintiffs from obtaining the logs they needed at a fair price. If you find this to be true, you may regard it as an anti-competitive act. Up above in the prior two paragraphs on the page that this is drawn from, you see the kinds of principles that have long governed definitions of anti-competitive or exclusionary behavior. Having the effect of frustrating or impairing the efforts of firms to compete for customers. Lacks a valid business purpose. Unreasonably or unnecessarily impedes the efforts of other firms to compete for raw materials. On balance, if you accept Brook Group, it was harmless error because we have these two other categories of fully sufficient, unchallenged evidence in Weyerhaeuser's JMOL. Let me try to make that point a little more specifically in terms of what the... Could you help me to understand what claims we're addressing here today? I thought that there were three areas that were sort of in dispute generally. The acquisitions, the overbuying, and the overpaying. And I thought your position was that the acquisitions and overbuying were forfeited because they were not challenged at the trial court level. That's correct. And I thought our focus then was on the overpaying claim. Well, the overpaying claim is only your focus if you accept Brook Group. And I have some other reasons I'll get into in a minute as to why Brook Group should not be extended in this novel and unprecedented fashion. I just wanted to understand where we were in terms of the oral argument. Is that your position, that the only one that's possibly in play on appeal is the overpaying claim? That's correct as it relates to the Brook Group argument. But where we contest Weyerhaeuser's effort to pigeonhole our case is only pricing. The same appellate counsel here tried to do this in LaPage's, is we had 15 allegations of anti-competitive conduct in our complaint. Only one of those categories was log pricing. The other 14 fell into seven different categories, and two of them were the overbuying and the acquisition of competitors, which were unchallenged by Weyerhaeuser and his JMOL. Which of those are on appeal? Which of those still remain for resolution on appeal? Well, in our view, there's no issue regarding the two that they unchallenged. But Weyerhaeuser seeks shelter in the following argument. They miscite Siufi for the proposition that our entire case was a log pricing legal theory. In fact, we had two legal theories in this case under Section 2 of the Sherman Act, monopolization and attempted monopolization. And we had 15 different specifications or contentions of anti-competitive conduct that supported each of those theories. Siufi stands for the proposition that a general verdict will not be upheld unless all of the legal theories in an antitrust case like Siufi are legally sufficient. We have, you can make a direct parallel to a negligence case. We have 15 allegations of anti-competitive conduct. In a negligence case, you might have six or eight or whatever number of allegations or contentions of negligent conduct that allegedly caused a personal injury. In a negligence case, if you have one of those allegations of negligent conduct that is unchallenged at the JMOL at the end of the case, and it is legally sufficient, that alone is enough to sustain the verdict. Here we had the same situation. We had 15 different allegations. Two of them were unchallenged. The acquisition of competitors was unchallenged because Weyerhaeuser, it was all in the extensive stipulated facts that were generated through no less than six pretrial conferences. And the second one as to overbuying, they hotly, they denied it. There's plenty of evidence to show that the jury could have so found that overbuying was done deliberately to keep logs away from Ross Simmons. And just like the negligence case, we have two items of anti-competitive conduct that support this general verdict, a general verdict that Weyerhaeuser wanted. Well, I thought you said that CEUFI requires that every theory that they offer has to survive. The distinction is legal theory versus contention or specification of conduct. We did not have a log pricing legal theory. We had monopolization and attempted monopolization. There are factual contentions underlying those theories, and we have to prevail on one or more in order to secure a verdict. That's the mischaracterization that Weyerhaeuser is trying to accomplish here. Counsel, just so I understand your argument. Certainly. Your argument is that regardless of whether or not Brooke group controls, you still win because the opposition forfeited its ability to challenge the other two over buying and acquisition portions of your monopolization and or attempted monopolization claim. That's correct. I understand your argument. And let me give you an example of where one of these tactics, the acquisition of competitors, did very significantly foreclose a big part of the log market to Ross Simmons. And, again, I start with Reed Brothers, which teaches that the same batch of tactics of anti-competitive conduct, they all focus on control through the timber supply. They control that market. One of the best examples was Weyerhaeuser's acquisition in 2000, in the last year before Ross Simmons exited the market as the longtime number two. They acquired a company called Coast Mountain Hardwoods in British Columbia with five 15- to 20-year exclusive licenses to virtually all of the public or the vast majority of the public timber supply for Alder in British Columbia. Now, was that a mill? A mill that had these long-term licenses as part, owned those licenses. There was testimony from an expert that if you have those licenses, and Weyerhaeuser acquired them outbidding Ross Simmons for that source of supply, which was the only remaining low-cost supply in the region, Weyerhaeuser got Coast Mountain, got those licenses, and this person testified that it was not possible to develop a mill of a similar size in the whole of British Columbia because of the foreclosure that those licenses, long-term licenses, provided. So let me... That's by outbidding your client? Right. The record shows that Ross Simmons made a bid of $26 million for that company. Weyerhaeuser swept in, made the same bid, was able to close faster and much greater financial strength, and the testimony was that Weyerhaeuser secured Coast Mountain and foreclosed that low-cost resource to Ross Simmons. The turnaround person then running Ross Simmons testified, had we gotten Coast Mountain, we'd still be alive today. That strikes me as legitimate competitive conduct, outbidding a competitor. In the ordinary context, it is, Your Honor, but not if you're a monopolist and you're doing it to increase and maintain your monopoly position in the log market. In conclusion, Your Honors, it is accepted antitrust law that the intent underlying a business strategy may assist the trier of fact in predicting the likely actual effect of that strategy, was the tactic designed for anti-competitive purposes or not. As the D.C. Circuit has said and was quoted in LaPage's, anti-competitive conduct can come in too many different forms and is too dependent upon context for any court or commentator ever to have enumerated all the varieties. Judge Panner noted below the Supreme Court's admonition that there are, quote, too many possible variations in antitrust to blindly apply a black-letter formula, and the bright-line theoretical distinctions that Weyerhaeuser demands must give way to the realities of the marketplace. One of our themes at trial was, with great power, a monopolist shoulders great responsibility. This point was put more eloquently in a quote from Justice Cardozo that was cited by the Third Circuit in LaPage's, a court that rejected this same pricing-only characterization to a bundled discount case and refused to extend Brook Group to a new context. What Justice Cardozo said in that quote was, size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been used in the past. Reed Brothers, in 1983, established that market power in a limited, regional, inelastic log market can be abused. The Ross Simmons jury below found some of the same tactics used to cause and destroy the business of the then number two competitor in this industry. Heaven help log competitors' sawmills in the West if Weyerhaeuser secures the bright-line formula rule that it seeks on appeal. The judgment should be affirmed. Thank you. Thank you, counsel. Rapato? I'd like to make three points, very briefly. The first has to do with the so-called other acts. The first thing I would say is that we've discussed why the other acts are not legally sufficient, that is, sufficient as a matter of law. There has been no waiver there. The only suggestion, by the way, as to where there is waiver on some other acts has to do with acquisitions, and that is something that was not even mentioned in the jury verdict. We think that under Sciufi, Judge Schwarzer, you're correct, that if you find that the jury instruction was incorrect on the pricing point, then reversal necessarily follows. But there's another, more important reason why that is true, and that is that the damage case here, the only damage theory that was put forward had to do with overpayment for logs. That's exactly the situation that this Court confronted in the Coastal Abstract case, which is the case on which plaintiff relies. You will find that 173 Federal 3rd at 729, where just this situation was presented. The second thing I would say is that the jury instruction itself was plainly incorrect. If you listen to Mr. Hagelin's argument here, he talks about recoupment, he talks about inelasticity, he talked about it at length. But if you look at the jury instruction, if inelasticity is somehow relevant, which we don't think it is, then where was that in the jury instruction? Where was recoupment in the jury instruction? We set out the jury instruction at page 41, and it seems to me that that cannot possibly be sustained. The third point that I would respectfully make is that unless this Court believes that your colleagues of an earlier era in Reed Brothers were wrong, they applied precisely of the analysis that we urge here. They just applied it at a different state of the law. We believe they got it right. We believe that these arguments that you heard from Mr. Hagelin about the need to expansively interpret Section 2 of the Sherman Act are not only bad policy, they are policy that has been clearly rejected by the United States Supreme Court. We urge reversal. Thank you. We're both relying on Reed Brothers. I'm sorry, Your Honor? We're both relying on Reed Brothers. One of you is wrong. Ah. One of us is wrong, or you could say Reed Brothers doesn't inform, and you have to do it again. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued, stands admitted for a decision by the Court. That completes the calendar for today. We are in recess.
judges: T.G. Nelson, Rawlinson, Pollak